## DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal Action No. 2014-00055** |
| **RAYMOND MATHURIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ——————————————————— | ) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Omodare Jupiter, Esq.,**
St. Croix, U.S.V.I.
    *For the Defendant*

## <u>MEMORANDUM OPINION</u>

THIS MATTER comes before the Court on Defendant Raymond Mathurin's "Amended Motion to Suppress." (Dkt. No. 25). In the Motion, Defendant seeks to suppress all physical evidence and statements allegedly obtained as a result of an illegal search and seizure on the grounds that he was unlawfully seized in violation of the Fourth Amendment. (*See id*. at 5-7). Defendant further seeks to suppress all statements allegedly obtained in violation of his Fifth Amendment right against self-incrimination on the grounds that he was in custody and interrogated but never advised of his *Miranda* rights. (*See id*. at 8-9). The Government opposes the Motion. (Dkt. No. 35).[1] For the reasons that follow, the Court will grant in part and deny in part Defendant's Motion.

---

[1] Defendant's "Amended Motion to Suppress" and the Government's Opposition were filed in case number 1:14-cr-00049. Upon motion of the Government, that case was subsequently dismissed following the filing of an Indictment, which initiated the instant matter—1:14-cr-00055. Defendant then re-filed his "Motion to Suppress" in case number 1:14-cr-00055. (Dkt. No. 5). The Government did not re-file its Opposition; therefore, unless otherwise indicated, citations are to 1:14-cr-00049.

## I.  FACTUAL BACKGROUND AND EVIDENCE[2]

On October 23, 2014, the Government filed a one-count Indictment charging Defendant Raymond Mathurin ("Defendant") with "Manufacture of Marijuana," in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). (1:14-cr-00055, Dkt. No. 1). At a suppression hearing held subsequently, the Court heard evidence and argument on Defendant's Motion to Suppress. Special Agent Brian Gaumond ("Agent Gaumond") of the Drug Enforcement Administration ("DEA"), who was called to testify by the Government, was the sole witness. The facts, according to Agent Gaumond, are summarized as follows.

On June 17, 2014, agents from the St. Croix High Intensity Drug Trafficking Areas ("HIDTA") program executed a search warrant at a residence located in Estate Stoney Ground, Frederiksted, Virgin Islands, where they seized marijuana, marijuana cultivation materials, equipment used to grow marijuana, and documents. At the time of the search, no residents were present. However, various documents and shipping labels found inside the residence revealed that the home was being used by Ronald and Okimo Milligan.

Although it appeared to the agents that the property was being used to cultivate marijuana, no marijuana plants were found on the property at the time of the search. Only loose marijuana was found, including already processed and packaged marijuana, a dried marijuana plant hanging from a clothesline, marijuana leaves, and debris. In an attempt to locate the seemingly missing marijuana plants, Agent Gaumond conducted a search to identify another location where Ronald or Okimo Milligan may have moved the plants. He discovered that Ronald Milligan owned another property located at 10-F Two Friends.

---

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purpose of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Approximately nine days later, on June 26, 2014, four DEA agents from HIDTA, including Agent Gaumond, traveled to the area of Estate Two Friends in Frederiksted, Virgin Islands, to look for 10-F Two Friends. Upon arrival, the agents observed Estate Two Friends to be a small rural area in the rainforest section of Frederiksted with undeveloped lots, open farm land, and a few structures or residences. None of the lots appeared to be numbered.

On one lot, in particular, the agents observed, three separate structures—a main residence and two "storage sheds"—surrounded by a barbed wire fence. They also observed blue water barrels, empty black plant pots, white Styrofoam cups, and a black bag of Pro-Mix potting soil. Based on training and experience, the agents were aware that these items are commonly used to cultivate marijuana and, therefore, believed the property belonged to Ronald Milligan.

The agents approached the property on foot and from the perimeter could hear the faint sound of a radio. One agent called out "Police, anyone home?" to get the attention of anyone on the property, but to no avail. Agent Gaumond and Resident Agent in Charge Wesley Fritz ("Resident Agent Fritz")—both clothed in police attire[3]—then entered the property through a closed, unlocked gate that was attached to a barbed wire fence and two wooden posts. As the agents approached the front door of what appeared to be the main residence—a yellow structure—Agent Gaumond noticed an individual (later identified as Defendant) exit from one of the other structures on the property. Defendant was initially observed sitting in the doorway, putting on a pair of boots. Agent Gaumond then watched him go back into the structure and quickly come out carrying a pick axe.

As Defendant walked away from the structure towards a wooded area, Agent Gaumond called out to him and waved, motioning for Defendant to come towards him. Defendant waved

---

[3] Agent Gaumond wore a net vest with the word "police" printed across the front in yellow letters and Resident Agent Fritz wore a shirt with the same lettering. The agents also had guns holstered at their hips. Neither agent's gun was drawn.

back and continued walking towards the woods. Agent Gaumond then called out again, "Yo, yo," and motioned again for Defendant to come towards him. Defendant complied and, still carrying the pick axe, began walking over to the yellow structure where Agent Gaumond and Resident Agent Fritz were standing.

When Defendant arrived at the yellow structure, Agent Gaumond asked him if he lived on the property. Defendant replied "yes" and explained that he and a friend, Lubrin, resided on the property. Defendant pointed to a structure towards the rear of the property—the structure he was observed exiting—and stated that he lived there. When asked by Agent Gaumond who lived in the yellow structure, Defendant replied that his friend, Lubrin, lived there. Resident Agent Fritz then asked Defendant if Lubrin was inside. He replied, "I don't know."

While Resident Agent Fritz spoke with Defendant, Special Agent DeFranzo ("Agent DeFranzo") and Task Force Officer Samuel ("TFO Samuel") walked along the perimeter of the property to the rear where they observed two vehicles parked on a dirt road. TFO Samuel checked the registration of the vehicles and learned that one was registered to Lubrin and the other to a woman—later identified as Defendant's girlfriend. TFO Samuel radioed this information to Resident Agent Fritz, who then informed Defendant that Lubrin's vehicle was still parked on the property, and asked him to check to see if Lubrin was inside the yellow structure. Defendant did, but was unsuccessful in getting the door to the yellow structure open—it was locked and he did not have a key.[4]

Throughout this conversation, Agent Gaumond testified that Defendant maintained in his hand the pick axe he was observed carrying towards the woods. Defendant was asked, on at least three occasions, to drop the pick axe. However, it was not until right before Defendant attempted

---

[4] At some point during this initial encounter with Defendant, Agent Gaumond mentioned that he and Resident Agent Fritz were looking for Ronald Milligan, and asked Defendant if he knew him. Defendant replied that he knew him, but that he did not live on the property.

to gain entry into the yellow structure that he dropped it. Agent Gaumond explained that the pick axe became an issue of officer safety after Defendant was asked to drop it, but did not do so. Agent Gaumond further testified that he placed his hand on his gun after Defendant initially refused to drop the pick axe.

After Defendant unsuccessfully attempted to gain entry into the yellow structure, Resident Agent Fritz advised Defendant that marijuana was observed growing on the property, along with other indicators of marijuana cultivation. Resident Agent Fritz then requested identification from Defendant. Defendant responded that his identification was in the structure he was initially observed exiting and he agreed to retrieve it. As Defendant began walking back to the structure, he picked up the pick axe he had previously been asked to drop. Agent Gaumond and Resident Agent Fritz, who followed behind him, once again asked him to drop the pick axe. He did so once he arrived at the structure where he lived.

Upon arrival at his home, Defendant went inside to retrieve his identification while Agent Gaumond and Resident Agent Fritz waited by the doorway. When Defendant came out with a driver's license, another agent called in the identification information to the police department to check for active warrants. The results came back clear. At this point, Resident Agent Fritz informed Defendant that, based on what had been observed on the property, there was enough evidence to get a search warrant. Resident Agent Fritz then asked Defendant if he would consent to a search of the property instead of requiring the agents to obtain a search warrant. Defendant answered in the affirmative.

Once Defendant gave Resident Agent Fritz consent to search, the other two agents— Agent DeFranzo and TFO Samuel—were advised of his consent and came onto the property to search near the yellow structure. Meanwhile, Resident Agent Fritz and Agent Gaumond walked

with Defendant up a hill in the direction where Defendant was initially seen walking. Once up the hill, Defendant stood to the side while Resident Agent Fritz and Agent Gaumond searched for marijuana plants. Initially, the agents were unable to locate the plants. Resident Agent Fritz advised Defendant that the agents would find them eventually, so he should just point them out. Defendant then walked over to a piece of plywood lying on cinderblocks and kicked it off. Under the plywood were a number of marijuana plants. Once the plants were exposed, Defendant allegedly stated, "I started these plants from seeds, but I'm not a big marijuana farmer." A second set of marijuana plants was found in close proximity to the first set of plants. Shortly after the second set of marijuana plants was found, Defendant was placed in handcuffs.

Meanwhile, the other two agents—Agent DeFranzo and TFO Samuel—discovered more marijuana plants towards the front of the property, near the yellow structure. After Defendant was told by Agent Gaumond that he was going to be charged with all the plants—approximately 100—Defendant stated that the plants by the yellow structure were not located on his property, and that any plants found near the yellow structure belonged to Lubrin. Defendant indicated that he would take responsibility for the plants on his property—the ones found on top of the hill— but not for any plants found near the yellow structure.[5]

When Agent Gaumond explained that Defendant would be charged with all of the plants if Lubrin didn't take responsibility for them, Defendant asked to call Lubrin. His handcuffs were then removed and a recording device was provided to facilitate the call. Once Defendant made contact with Lubrin, Lubrin agreed to come to the property. Agents waited approximately 20

---

[5] Agent Gaumond later learned that the property consisted of two lots—one owned by Lubrin and the other owned by Defendant. He testified at the suppression hearing that the two properties were observed to be open and joined together with no distinct property line or fence between them. From where the parked vehicles were observed, both Defendant and Lubrin would have to walk the same property line to get access to their respective lots. It appeared from his observations that the entire property, consisting of the two lots, was being utilized jointly by both Defendant and Lubrin to cultivate marijuana.

6

minutes for Lubrin to arrive, but when it appeared that Lubrin was not coming back, Defendant was arrested and transported to the HIDTA office for processing. A total of 69 plants were seized from Defendant's property.[6]

## II.    DISCUSSION

In the instant Motion, Defendant seeks to suppress both the statements he made to Agent Gaumond and Resident Agent Fritz and the marijuana plants seized during the search of his property. In support of his Motion, Defendant makes two arguments. First, he argues that he was unlawfully seized in violation of the Fourth Amendment when he acquiesced to Agent Gaumond's command to walk towards the yellow structure, where Agent Gaumond and Resident Agent Fritz were standing. (*See* Dkt. No. 25 at 6). Thus, the subsequent search of his property was unlawful. Second, Defendant argues that his Fifth Amendment right against self-incrimination was violated when Agent Gaumond and Resident Agent Fritz elicited statements from him in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (*See id*. at 8). The Court will address each argument in turn.[7]

### A.  The Fourth Amendment

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV; *see also* 48 U.S.C. § 1561 ("The right to be secure against unreasonable searches and seizures shall not be violated."). "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California*

---

[6] As the agents began to travel back to the HIDTA office, Lubrin was observed approaching the property. Agent Gaumond and Resident Agent Fritz returned to the property to arrest him for the plants found on his property. A total of 58 plants were seized from Lubrin's property.

[7] The Court notes that Defendant also argued that the agents illegally entered the curtilage surrounding his home— i.e., Lubrin's property—in violation of the Fourth Amendment. (*See* Dkt. No. 25 at 3-5). However, at the suppression hearing, Defendant conceded that he has no constitutional standing to challenge the agents' entry onto Lubrin's property, and therefore waived that argument.

*v. Acevedo*, 500 U.S. 565, 580 (1991)). Evidence obtained as a result of an unreasonable search and seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (requiring exclusion and suppression of evidence obtained as the result of an unlawful search and seizure).

### 1.  Seizures under the Fourth Amendment

The initial step of any Fourth Amendment seizure analysis is "to determine whether a seizure took place and, if so, when the seizure occurred." *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)). The Supreme Court has articulated that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (stating that "[a] seizure occurs whenever an officer restrains the freedom of a person to walk away") (citation and internal quotation marks omitted).

The Supreme Court has clarified that the "free to leave" analysis is not applicable in situations where an individual's "freedom of movement was restricted by a factor independent of police conduct[,]" *Florida v. Bostick*, 501 U.S. 429, 436 (1991), such as when the person "has no desire to leave," *id.* at 435. Under such circumstances, the appropriate inquiry is whether a reasonable person would feel free to "'disregard the police and go about his business,' or ultimately 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter' . . . ." *United States v. Kim*, 27 F.3d 947, 951 (3d Cir. 1994) (quoting *Bostick*, 501 U.S. at 434, 436).

It is well-established that a Fourth Amendment "'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Bostick*, 501 U.S. at 434). Such an encounter, that is short in duration, is characterized as "consensual" and does not amount to a Fourth Amendment seizure because "the citizen has the ability to engage in or terminate the encounter." *Id.* (citing *United States v. Wilson*, 413 F.3d 382, 386-87 (3d Cir. 2005)). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [the court] conclude that a 'seizure' has occurred." *Bostick*, 501 U.S. at 434 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968)); *see also Berg v. Cnty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) ("A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement.").

There is no allegation in this case that Agent Gaumond or Resident Agent Fritz exerted physical force over Defendant. The allegation is that Agent Gaumond seized Defendant by virtue of a show of authority. The issue before the Court, then, is whether Agent Gaumond made a show of authority sufficient to constitute a seizure and, if so, whether Defendant submitted to that show of authority. *See United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009) ("The simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized."); *see also United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) ("A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) *submission* to 'a show of authority.'") (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis added)).

9

The Supreme Court has stated that "the test for [the] existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628 (citing *Mendenhall*, 446 U.S. at 554); *see also Brown*, 448 F.3d at 245. This objective "'reasonable person' test presupposes an *innocent* person," *Bostick*, 501 U.S. at 438 (citation omitted), and looks at "all of the circumstances surrounding the encounter," *id*. at 437. Specific factors a court may consider include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554 (citations omitted). The location of the encounter may also be relevant. *See Bostick*, 501 U.S. at 437.

The encounter at issue in this case began when Agent Gaumond initially called out to Defendant and motioned for him to walk towards the yellow structure, where he and Resident Agent Fritz were standing. When Defendant responded by waving and continuing to walk in the direction of the woods, Agent Gaumond called out again and for the second time motioned for Defendant to walk towards him. Defendant then changed the direction in which he was walking and walked to meet Agent Gaumond and Resident Agent Fritz. The critical moment for purposes of this Court's analysis occurred when Agent Gaumond motioned the second time for Defendant to walk towards him. At that moment, Defendant complied with Agent Gaumond's hand signal.

During the suppression hearing, Defendant argued that the circumstances surrounding his encounter with Agent Gaumond, taken together, communicated to him that he was not "free to walk away." Defendant first argued that because the encounter occurred on his private property

he had a heightened expectation of privacy and that the nonpublic setting substantially increased the coercive nature of the encounter.

The location of an encounter is a factor to consider, but it is not dispositive. *Bostick*, 501 U.S. at 437 ("Where the encounter takes place is one factor, but it is not the only one."). The Third Circuit has explained that "[t]he location [of an encounter] in itself does not deprive an individual of his ability to terminate an encounter; he can reject an invitation to talk in a private, as well as a public place." *Kim*, 27 F.3d at 952 (footnote and citation omitted). Similarly, "[t]he high expectation of privacy [one has in his home], alone, will not destroy the otherwise consensual nature of [an] encounter." *Id*. at 953 (footnote and citation omitted). Accordingly, the fact that the encounter in this case occurred on private property does not, without more, transform the encounter into an illegal seizure.

Defendant next argued that the fact that both Agent Gaumond and Resident Agent Fritz were clothed in police attire and wore visible firearms added to the coerciveness of the situation. As the Supreme Court has explained, however, whether an officer is in uniform and visibly armed has "little weight in the [seizure] analysis" because "[o]fficers are often required to wear uniforms and in many circumstances this is a cause for assurance, not discomfort." *United States v. Drayton*, 536 U.S. 194, 204 (2002). The same logic applies to firearms. "That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Id*. at 205. In this case, there is no evidence in the record that Agent Gaumond brandished his weapon while gesturing for Defendant to walk towards him.

Defendant also argued that he walked away when Agent Gaumond called out and waved to him the first time, and that he only acquiesced to a show of authority after Agent Gaumond

repeated his actions a second time. However, there is no evidence in the record as to what Defendant actually thought or understood. At the suppression hearing, Agent Gaumond testified that it appeared based on Defendant's initial response that Defendant thought Agent Gaumond was waving to him. The Court finds that it is objectively reasonable to so conclude in view of the fact that Agent Gaumond and Resident Agent Fritz were in the vicinity of the yellow structure—a residence known by Defendant to belong to Lubrin—and Defendant responded to Agent Gaumond's initial beckoning with a wave. Under the circumstances here, it is reasonable to conclude that Defendant's initial response did not constitute a rebuff of the agents, but rather a cordial response to what was perceived to be a greeting from agents who—unbeknownst to the agents, but known to Defendant—were standing in front of Lubrin's residence. Accordingly, this Court does not agree with Defendant's contention that his actions reflected a rebuff of Agent Gaumond's initial overture to him followed by an involuntary acquiescence to police authority.

Further, the fact that Defendant continued to walk towards the woods after Agent Gaumond called and waved to him the first time does not render Agent Gaumond's repetition of these actions a show of authority. The Court finds that it was reasonable under the circumstances for Agent Gaumond to repeat his actions, especially because, as discussed above, Agent Gaumond believed that Defendant misunderstood him. In addition, at the time Agent Gaumond called out and waved to Defendant, Defendant was a substantial distance away from where the agents stood; there was no force used by either of the agents nor a display of weapons; the agents did not block the exits to Defendant's property; and, although Agent Gaumond yelled "Yo, yo" to Defendant, there is nothing in the record that suggests that this verbal communication was coercive or that Agent Gaumond used a commanding tone of voice.

In short, the Court finds that, under the totality of the circumstances, a reasonable person in Defendant's position would not have felt that he lacked the freedom to walk away when Agent Gaumond motioned the second time for Defendant to walk towards him. Therefore, the encounter between Agent Gaumond and Defendant was consensual and not a seizure subject to the protections of the Fourth Amendment.

The Court notes that Defendant also bases his Fourth Amendment seizure theory on the fact that when he arrived at the yellow structure, Agent Gaumond and Resident Agent Fritz repeatedly ordered that he drop the pick axe he held in his hand. Although the Third Circuit has held that "a 'stop' is effected when police wear down an uncooperative suspect by making clear the need for compliance," *United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009) (citing *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003)), "[t]he simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without *actual submission* on the part of the person allegedly seized." *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009) (emphasis added).

In this case, Agent Gaumond and Resident Agent Fritz initially asked Defendant at least three times to drop the pick axe he held in his hand. Agent Gaumond testified that the pick axe was an issue of officer safety, and that after Defendant refused to drop it, he placed his hand on his gun. The record reflects that Defendant briefly dropped the pick axe right before he attempted to gain entry into the yellow structure, but picked it up again as he walked to his home to retrieve his identification. The agents then made several more requests for Defendant to drop the pick axe; however, Defendant did not put it down until he arrived at his home.

It appears from the facts that Defendant dropped the pick axe at his convenience rather than as an act of submission to a show of authority by the agents. Even assuming, *arguendo*, that

13

the agents' request to Defendant to drop the pick axe was a show of authority, Defendant cannot be said to have actually complied with that authority. *See United States v. Richardson*, 504 F. App'x 176, 181 (3d Cir. 2012) ("Even if there is a show of authority, 'there is no seizure without actual submission.'") (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). Actual submission "requires, at minimum, that a suspect manifest compliance with police orders." *Waterman*, 569 F.3d at 146 n.3.

It is difficult for the Court to conclude that Defendant actually submitted to an alleged show of authority when he appeared to put down the pick axe only based on the circumstances of what he happened to be doing at the time—i.e., when he attempted to gain entry into the yellow structure and when he went into his home to retrieve his identification. Momentarily dropping the pick axe to attempt to gain entry into the yellow structure and then picking it up again as he walked to his home does not reflect actual submission to a show of authority. *See United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000) (finding "[e]ven if [the defendant] paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure"). If anything, these actions more accurately demonstrate that Defendant was defying authority, not submitting to authority.[8] Thus, the Court concludes that the issue regarding the pick axe does not transform the agents' encounter with Defendant into a seizure for purposes of the Fourth Amendment.

---

[8] At the suppression hearing, Agent Gaumond testified that as Defendant walked to his home to retrieve his identification, he stated to the agents—after their repeated requests to drop the pick axe—"What am I going to do? You have guns." To which, Agent Gaumond responded: "It's just a safety issue, please just drop it." As stated above, Defendant continued to hold the pick axe in his hand until he arrived at his home. The Court notes that Defendant argued that this interaction between Defendant and the agents provides further support for the conclusion that Defendant was seized. However, the Court finds otherwise, and concludes that this interaction further reflects the extent to which Defendant was acting of his own accord and not in response to a show of authority. *See Waterman*, 569 F.3d at 146 (A seizure "require[s] something more than a momentary pause or mere inaction.").

### 2. Consent to Search

Because the Court has concluded that Defendant was not seized within the meaning of the Fourth Amendment, the Court must now determine whether Defendant voluntarily consented to the search of his property. *See United States v. Crandell*, 554 F.3d 79, 87 (3d Cir. 2009) (stating that "[i]f the District Court determines that [a defendant] was not seized during his encounter with police, then the Court must evaluate whether he voluntarily consented to [a search]") (citing *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005)). Generally, "[w]arrantless searches of the home 'are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion.'" *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014) (quoting *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006)). In this case, the Government contends that Defendant voluntarily consented to the search of his property. (*See* Dkt. No. 35 at 8).

To justify a warrantless search based on consent, the Government "has the burden of proving [by a preponderance of the evidence] that the consent was . . . freely and voluntarily given." *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (internal quotation marks omitted)); *see also United States v. Matlock*, 415 U.S. 164, 177 (1974). The voluntariness of consent is determined by "examining the totality of the circumstances," including "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *Id*. at 278 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The "setting in which the consent was obtained," as well as "the parties' verbal and non-verbal actions" are also relevant. *Id*. (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) (internal quotation marks omitted)).

15

In the instant case, Defendant's voluntary consent to the search of his property is amply reflected in the record. After Resident Agent Fritz informed Defendant that there was enough evidence to get a search warrant, he asked Defendant if he would consent to a search of the property instead of requiring the agents to obtain a search warrant. Defendant consented and cooperated by walking with Agent Gaumond and Resident Agent Fritz up the hill where his marijuana plants were located. He then pointed out the plants after Resident Agent Fritz advised him that they would find them eventually. Resident Agent Fritz's communication to Defendant of an "appraisal of the realities" faced by Defendant did not render the consent involuntary. *See United States v. Claus*, 458 F. App'x. 184, 189 (3d Cir. 2012) (quoting *United States v. Sebetich*, 776 F.2d 412, 425 (3d Cir. 1985) (internal quotation marks omitted)). Moreover, there is no evidence that Defendant was unable, by virtue of age or intelligence, to understand the circumstances surrounding his consent and subsequent actions.

In an analogous case, *United States v. Claus*, where an officer indicated to the defendant that it was highly likely that a search warrant would issue, the Third Circuit affirmed the district court's finding that the defendant voluntarily consented to the search of his house and surrounding property, stating:

> The officers' suggestion that a search warrant would most likely issue and that consent would spare [the defendant] of the disruptions associated with a warrant's execution did not suffice to render [the defendant's] consent involuntary. As the District Court found, the officers did not make affirmative misrepresentations insinuating that [the defendant] had no choice but to consent; they merely provided a permissible "appraisal of the realities" he faced.

*Id*. The same is true here.

There is no evidence that Defendant was coerced into giving consent. At the suppression hearing, Agent Gaumond testified that 15 minutes had elapsed between the time he motioned for Defendant to walk towards the yellow structure and the time Defendant gave consent; no hostile

tones were used when Resident Agent Fritz asked Defendant for consent; Defendant appeared calm when he consented; and there was no physical contact between the agents and Defendant, nor were any weapons drawn. In addition, at all relevant times, Defendant was on his property, which did not appear to have been blocked in any way by the agents. Based on these facts, the Court concludes that Defendant voluntarily consented to the search of his property. Accordingly, the search was constitutionally permissible under the Fourth Amendment and the marijuana plants seized as a result of the search will not be suppressed.[9]

### B.  The Fifth Amendment

In *Miranda v. Arizona*, the Supreme Court established the now well-recognized legal principle that under the Fifth Amendment the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). A custodial interrogation has been defined as an "inquiry [] conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought" held in "custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (citing *Miranda*, 384 U.S. at 467; *Garner v. United States*, 424 U.S. 648, 657 (1976)).

The Supreme Court has explicitly stated that law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429

---

[9] Although the Court has found that Defendant was not seized within the meaning of the Fourth Amendment, the Court notes that consent to search will purge the taint of an unlawful seizure if consent is "obtained voluntarily under the circumstances." *United States v. Narcisse*, 501 F. App'x. 142, 145-46 (3d Cir. 2012); *accord United States v. McSwain*, 29 F.3d 558, 562 (10th Cir. 1994) (stating that "a search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances") (citation and internal quotation marks omitted). Thus, even assuming, *arguendo*, that Defendant was unlawfully seized, because the Court has found that Defendant voluntarily consented to the search of his property, the subsequent search would not violate the Fourth Amendment.

U.S. 492, 495 (1977). *Miranda* warnings are only required when a suspect is "(1) 'in custody' and (2) subject to 'interrogation' by the [g]overnment." *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (citations omitted). A suspect is "in custody" when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Based on the record before the Court, Defendant was placed in handcuffs shortly after a second set of marijuana plants was discovered on his property. At that time, Defendant was "restrained to a degree normally associated with formal arrest and, therefore, in custody" for purposes of the Fifth Amendment. *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.").[10]

There is no evidence on the record that Defendant was given *Miranda* warnings. However, *Miranda* warnings are only required when a person in custody is subjected to "express questioning" or its "functional equivalent." *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). The Supreme Court has defined the term "interrogation" as follows:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is

---

[10] The Court recognizes that Second Circuit precedent is not controlling authority in this jurisdiction; however, the Court finds this decision of the Second Circuit persuasive.

reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

*Id*. at 301 (footnotes omitted).

The first statement Defendant seeks to suppress was made before he was placed in handcuffs. At the suppression hearing, Agent Gaumond testified that, after the first set of marijuana plants was uncovered, Defendant stated, "I started these plants from seeds, but I'm not a big marijuana farmer." At the time Defendant made this statement, he was neither in custody nor subject to interrogation for *Miranda* purposes. Rather, the statement was made voluntarily after Defendant kicked a piece of plywood and uncovered a number of marijuana plants growing on his property. The Supreme Court has stated that:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment . . . .

*Miranda*, 384 U.S. at 478; *see also Arizona v. Mauro*, 481 U.S. 520, 529 (1987). Therefore, any voluntary statements made by Defendant before he was placed in handcuffs will not be suppressed—including, "I started these plants from seeds, but I'm not a big marijuana farmer."

The other statements Defendant seeks to suppress were made after he was placed in handcuffs. According to Agent Gaumond, after Agent DeFranzo and TFO Samuel discovered marijuana plants near the yellow structure, Agent Gaumond informed Defendant that he was going to be charged with the two sets of marijuana plants found on his property, as well as the marijuana plants found near the yellow structure—approximately 100 marijuana plants. In response, Defendant stated that the marijuana plants by the yellow structure were not located on his property, and that any marijuana plants found near the yellow structure belonged to Lubrin.

Defendant then stated that he would take responsibility for the marijuana plants on his property, but not for any marijuana plants found near the yellow structure. When Agent Gaumond explained that Defendant would be charged with all of the plants if Lubrin didn't take responsibility for them, Defendant then asked to call Lubrin so that Lubrin could come back to the property and take responsibility for his plants. A recording device was provided to Defendant to facilitate the call.

Although the statement by Agent Gaumond—after Defendant was in custody—that Defendant was going to be charged with the marijuana plants found on his property as well as the marijuana plants found near the yellow structure was not express questioning, the Court finds that it was the "functional equivalent" of interrogation "likely to elicit an incriminating response." *See, e.g.*, *Pirzadeh v. State*, 854 So. 2d 740, 742-43 (Fla. Dist. Ct. App. 5th Dist. 2003) ("Once the detective told [the defendant] about the nature of the charges against him, he should have terminated the confrontation as it became clear that continuing the conversation would lead to an incriminating response."). Accordingly, Defendant was entitled to *Miranda* warnings. The failure of Agent Gaumond to give Defendant *Miranda* warnings renders his statements—obtained in violation of his Fifth Amendment right against self-incrimination—inadmissible. Thus, the Court will suppress in this matter the statements Defendant made after Agent Gaumond informed him of the nature of the charges that he would face.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Defendant was not seized for purposes of the Fourth Amendment, and that Defendant voluntarily consented to the search of his property. Accordingly, the Court will not suppress the marijuana plants seized during the search of Defendant's property.

The Court also finds that Defendant was not given *Miranda* warnings. The Court will not suppress any voluntary statements made by Defendant before he was placed in handcuffs—including, "I started these plants from seeds, but I'm not a big marijuana farmer." However, the Court will suppress in this matter the statements Defendant made after Agent Gaumond informed him of the nature of the charges that he would face.

An appropriate Order accompanies this Memorandum Opinion.

Date:  January 29, 2015

_____/s/_____
WILMA A. LEWIS
Chief Judge